Mr. Reeder, are you ready to proceed? Tony, turn that off. I can't hear. Yes, Your Honor, this is Tom Reider for Allegheny Ludlum. Okay. And we would request permission, if it's acceptable to the Court, to reserve three minutes for rebuttal. That's fine. Thank you, Your Honors. As the Court is aware, there are a number of issues before the Court on appeal. We can perhaps group them into three. There's the Liberty Mutual and Hartford issues concerning the statute of limitations, the USF&G issues concerning the pollution exclusion, and the wantonness issue. And then the issues presented by Allegheny Ludlum's own motion for summary judgment. There's also an issue with USF&G in terms of whether or not the $1 million comes off of your dime or their dime because of the deductible. It's not called a deductible. It's a fancy term for it, but it's a deductible of $1 million. You're correct, Your Honor. We propose to begin with the statute of limitations issue, which is a Liberty and Hartford issue only. This didn't occur to me actually until a few minutes ago, so I didn't get a chance to confront my colleagues about it or win it by you. Would it make sense, given there's some, I guess, discrepancy or debate about the scope and application of the so-called Pennsylvania rule in terms of when a cause of action accrues or when the statute of limitations begins to tick, would it make any sense to certify that part of this litigation to the Pennsylvania Supreme Court? Because a lot of the cases being argued here are Middle District Pennsylvania cases, or one cases anyhow, and Pennsylvania Superior Court cases. We've got one case from the Pennsylvania Supreme Court, and there's some, I guess, issue about the validity, the continued validity of that case. So would certification make sense? Your Honor, our view would be that the application of Pennsylvania law is clear here and requires reversal on that issue. But it is an interesting suggestion that I'd like to give some consideration to if I might. So the context, as the court is aware, where we have these divergent proposals before the court is not an uncommon one. That is to say a scenario in which, if you will, in year one, the insurers for these purposes will assume deny coverage for an underlying claim for coverage in connection with an underlying piece of litigation. That litigation continues on for a number of years. And let's say six years down the road, an underlying court denies the motion for summary judgment, which the court will be aware is exactly what happened here. And then in the seventh year, the underlying case settles. So seven years out from the so-called denial, the underlying case settles. The policyholder brings the coverage action right away. And the question is, does the statute begin to run only upon the conclusion of the underlying case or does it start to run at the date of the purported initial denial? Isn't that what selective tells us? Your Honor, no, that is not what selective tells us. Selective tells us that if an insurance company wishes to bring a declaratory judgment action and the insurance company has the information to determine that it does not believe that there's coverage and there's a coverage dispute, it cannot sit on its rights. Selective notes that the insurance company has the ability, of course, always just to not pay the claim. And in that respect is in a different position than a policyholder, the insurance company that has to bring a declaratory judgment action within four years of when it knows it's not going to cover the claim. It's not penalized in that fashion where a policyholder would be. But selective way, Your Honor, did not involve a scenario in which an underlying claim continued for many years, as I've just described in our situation. And the policyholder itself was being tasked to bring a coverage action before the underlying claim concluded. So selective way does not engage with nor would one expect it to engage with the body of law that is set forth in our brief, the Moffitt case and Weisman and so forth. The court simply doesn't confront that issue. And in fact, frankly, acknowledges that there's really no Pennsylvania law on this of any kind. So selective ways own understanding of the way the issue is presented to it reflects the court's awareness that it was dealing with a very different scenario than the so-called Moffitt case. And the Moffitt case, Your Honors, is a case that is from 1964. It's a very old case. It set forth a rule of law that has been followed by the majority of courts throughout the country that have confronted the issue and has itself been cited. In Pennsylvania, the Moffitt approach has not generated any Pennsylvania state court appellate law, which I think was the point that was being made before. But from that, I think one can conclude that we had a rule of law that works. It's a rule of law in which the policyholder is not put in the position of having to bring coverage litigation while it's trying to defend itself in the underlying case before it even knows whether it will have to pay a settlement. This Pennsylvania approach you're advocating is really only memorialized in these two middle district opinions, right? It's memorialized, Your Honor, in the 1964 Moffitt decision. Which is a middle district opinion, right? These two district court opinions. They're not Pennsylvania state court opinions. They are not Pennsylvania state court opinions. There's a court of common pleas opinion in the Wartring case. And then there's the decision of this court in Scarica, which admittedly does not address this issue because it was dealing with the question of when a bad faith claim commences to run. But in the course of that decision, it's obvious that the insurance company itself recognized that a gap of 10 years or more from a denial to the inception of a coverage litigation is not a reason why an insurer can raise a statute of limitations defense. And this court itself cites Moffitt in that case and does not in any way criticize it for applying what we call the Pennsylvania approach. We'd also note, Your Honor, that the Pennsylvania appellate court law that the trial court relies on and the insurers rely on is appellate court law that never once raises, cites, addresses any case law involving a scenario that we have here. Which is to say a policyholder bringing a coverage claim in connection with the underlying litigation that spans many years. So neither Bristol nor Green nor Selective Way involve that scenario. Bristol and Green involve scenarios where the underlying claim was resolved before any alleged breach. So I think it's fair to say that the Pennsylvania courts have never contradicted in any way the Moffitt or the Weissman case. And the Weissman case, I would suggest, it is just a district court case, of course, and we're before the Third Circuit. But the Weissman case, which is from the same district as the underlying decision here, contains a rather comprehensive and persuasive analysis of the law in Pennsylvania and throughout the country. The other point I would make, Your Honors, is that the consequence of an alternative approach, the one the district court applied here, will be for policyholders in the pain of forfeiture to bring coverage litigation every single time an insurance company issues something that might be construed to be a denial, even though they may never have any dollars at stake in the claim that would justify such coverage litigation. Well, you know, that's part of my concern here in terms of the application, excuse me, of any decision. If we put the clock too early, at the time at which the obligation to indemnify is too early, and if you don't act then as a policyholder or as insured, the clock can run out on you. I would imagine there are many cases where the amount of the indemnification has not been quantified yet. It may not be quantified for several years here, I guess we're talking about decades. And I guess I'm wondering how that rule would work if it's applied in that situation. How do you know how much you pay? I think that you put your finger on exactly the common sense practical problem with the approach of the district court. And earlier you were raising the issue of deductibles, which further complicates things because many policies have these provisions in them that mean as a practical matter, there's no real recovery for the insured until you exceed a certain amount of money. And in that situation, with the rule of law that the district court adopted, would highly incentivize policyholders in those situations to bring coverage actions before they even exceeded the deductible or had any idea whether they ever would. And there's no reason to adopt a different approach than the one that's worked well in the Commonwealth of Pennsylvania for nearly 50 years, more than 50 years really. And again, I emphasize that the Pennsylvania Superior Court decisions in which the trial court relied did not in any way address any of these issues because they weren't confronted with these issues. I know you've got some time for your rebuttal, and I just saw a pop up you've got five minutes left. But I'm also wondering about the exclusion here. The pollution exclusion and how that would apply if it applies. So the pollution exclusion, Your Honor, is an issue only for USF and G. Liberty Mutual and Hartford are not raising that issue. And as we've set forth in our papers, the USF and G position should be rejected because USF and G did not introduce evidence probative, let alone dispositive of the critical question of whether of whether there had been a release of a type that would justify the application of the exclusion. And that is a burden that USF and G had. That is not an issue as to which my client, Eleni Ludlum had the burden USF and G had and USF and G did not hire an expert did not put in any evidence in this case to show that the process by which the fumes were created and then released is a release within the meaning of the exclusion. And we're talking about release of fumes as opposed to handling the ingredients that went into the manufacture of mufflers, the physical contact as opposed to the inhalation or airborne. One of the issues here is exactly what we're talking about. And I think that, again, is the burden of USF and G to prove that. But my understanding is that we're talking about releases, alleged releases into the atmosphere that supposedly over a long period of time cause injuries to the plaintiffs. In the underlying case, there wasn't any need to delve into the process by which the movement happened. But under the Supreme Court decision in Steely in Pennsylvania, that is a factual issue that must be addressed. And USF and G submitted no expert testimony in that point and simply tries to bootstrap underlying discovery that is hearsay in nature into this case. The second point on the pollution exclusion, Your Honors, is on its face. The exclusion only applies if USF and G could show that all of the injuries the plaintiffs suffered would have been suffered were caused but on a but-for basis by Allegheny Ludlam's product. And here we have dozens of defendants whose products supposedly caused these injuries. And there's no way to know for sure that the plaintiff's injuries were caused only because there was a USF, because there was an Allegheny Ludlam product. So on a but-for basis, USF and G hasn't met its burden. Just briefly interrupt you. Because the number of issues here and the complexity, I just instructed Patrick to add nine minutes to your time and to also then rather than getting into the math and the fractions, simply add three minutes to each of the apologies unless they want to divvy it up differently. So they would actually have now seven minutes, seven minutes and 10 minutes and you have an extra nine minutes. Okay. And Your Honor, I have how much more time now? Nine minutes in addition to the time you initially had. Patrick can tell you how much is left. Thank you, Your Honors. So, again, on the pollution exclusion, the basic point is USF and G did not put in the evidence they need to put into the record to prove what needs to be proved under Pennsylvania law, given the rules of construction. And essentially what the district court did was relieve it of that burden by finding that in the Madison case, the Pennsylvania Supreme Court ruled that a fume case fell within the exclusion. But that doesn't apply here because here the facts necessary to show that there was a release and that it was a but-for cause simply not present. With respect to the issue of the wantonness question, which, again, is only a USF and G issue, that is not an issue raised by Liberty Mutual or Hartford before this court. We have a scenario that, as the court is, I'm sure, well aware, again, not uncommon. That is to say a product liability bodily injury claim brought against the manufacturer of a product. There are thousands and thousands of these cases where the allegation is that there was exposure to harmful substances that caused bodily injuries. I'm unaware of any case, and certainly none have been cited, in which a court has ruled that in that context a recklessness-based claim is outside the coverage because it's not a covered occurrence or accident. So while there are many, many cases cited in the party's papers, none of them are cases in the fact pattern that I've just described. And I would suggest that what the district court below embraced, which is to say that there's no coverage because the injuries were allegedly the natural or expected or foreseeable result of conduct. If that test is applied, the courts in this commonwealth and throughout the country would be faced with situations where insurance companies would have no obligation anymore to cover many, many toxic tort cases that they clearly are intended to cover. Yes, in terms of the Wantonness claim, it's an interesting and somewhat confusing case. Was that the only issue before the Alabama Supreme Court was appealed to them? So in the underlying case here, we call it the Belcar case. In the underlying case here in Belcar, the Alabama Supreme Court made a ruling that in effect meant that the only claims that the plaintiffs could bring against Allegheny Court were wantonness. And that was because of a statute of limitations ruling that knocked out negligence and other sorts of claims on the facts presented and left only wantonness with a six-year statute. And so the case proceeded against Allegheny Ludlam in an amended complaint that looked a lot like the original case, except now the boilerplate scienter allegations were merely recklessness. Otherwise, it's the same thing. We made a product that caused harm to the plaintiffs. It's a supposedly product that has harmful capacities and harmful characteristics and therefore reliable for their injuries. But it is a basic product liability case, except now it's merely a recklessness case. Now, what USF&G is seeking to do is to apply various cases either from the Supreme Court of Pennsylvania or from the Third Circuit in which the court has confronted the question of whether a particular fact pattern qualifies as an occurrence or an accident. And the synthesis that we would suggest that one can derive from those cases is this, that in determining whether a particular claim can qualify as an accident, it's not enough to simply look at the label that the plaintiff attaches to his complaint or her complaint. You can't just say this is a negligence case, therefore it's covered. You can't just say this is a recklessness case, therefore it is or isn't covered. You need to look at what is involved. So if you have a faulty workmanship case, a case in which you essentially have an underlying dispute between a product maker and the party to whom he supplied the product, that kind of case under Pennsylvania law is generally thought of as something that is not accidental. Because it is in the nature of a commercial type dispute and the expectation is that that kind of claim is not within the coverage to be provided. Similarly, if you send a fax, you know that when you send the fax to the recipient that the recipient is going to use toner and so forth to receive the fax. So you can't argue if it's a TCPA claim that somehow is not an accident. Here, we have a paradigmatic covered scenario, a bodily injury product liability claim. It's exactly the kind of claim that the Coverner Court suggests is the kind of thing that a general liability insurance policy is intended to cover. And the only thing that's different from this and any other case is, as I've just explained, the plaintiffs, because of statute of limitations, were required to allege only wantonness. And wantonness, which is akin to recklessness, is potentially covered under Pennsylvania law, given the Alitsky case and other cases. And when you look at what the case really involves, it's evident that the case involves something that can be accidental. You make a product, it is an accident if a third party user or worker that's exposed to the product is caused bodily injury as a result thereof. Let me briefly move to our summary judgment motion. Our motion, essentially, the court would reach, assuming the court agrees with us on at least some of the issues we just discussed. And our motion is opposed before this court, primarily on the ground that the policies of Liberty Mutual and Hartford allegedly are not triggered. And the reason that Liberty Mutual and Hartford advanced that argument is they take the view that because of the Alabama Supreme Court ruling and Alabama law and various communications between the parties, primarily in connection with settlement, it was obvious that the plaintiffs could not recover for bodily injuries that took place during the period of their policies. The problem with this argument is primarily this, the underlying complaint alleged bodily injury during their time period. The plaintiffs in that case never amended or removed those allegations. And when Allegheny Ludlam and other defendants sought a ruling seeking dismissal of claims based on those bodily injuries, the plaintiffs did not agree to do that. The motion was contested and the trial court denied the motion. So as a practical matter, what we have here is a situation in which a complaint has allegations that trigger their coverage. There's an argument under the law that the plaintiffs were not entitled to recover for those bodily injuries on the basis of statute of limitations. But that argument was never accepted, and that argument, as you think about it, can never be a basis for an insurance company to avoid its duty to defend a policyholder. Merely because a policyholder has a good legal defense to a claim, merely because the claim may be groundless, is never a reason for an insurer to avoid continuing to defend its policyholder. In fact, the insurance company is supposed to defend the policyholder so that it can make that type of claim. You might be looking at a bad faith claim if you were to rely upon the merits of the underlying claim to effuse coverage. That's correct, and Your Honor, we also, you're touching on another issue which I'll briefly mention, which is that while we did not move for summary judgment on bad faith, we did include in our underlying coverage complaint account for bad faith. And one of the issues before the court is whether that bad faith claim should be dismissed because we supposedly failed to produce the necessary evidence. And in our brief, we go through and we show that the evidence, in fact, is more than sufficient to allow us to go to trial. In fact, this is a case in which, while Liberty Mutual and Hartford were taking the view that they had no obligation to cover Allegheny Ludlam for pre-1999 exposures, at the very same time, with other policyholders, they were affording such coverage, although never telling us that. So this is a case in which the evidence that we put in the record and that is mentioned in our brief is at a minimum sufficient to survive a summary judgment motion on bad faith. Thank you, counsel. We did actually afford extra time. I should have allotted more than 15 minutes initially. This case just merits more than that. But because you afforded extra time, I want to be a little more disciplined than usual about quoting counsel to the time that we've allotted. So unless either of my colleagues have questions, we'll hear from my tech, who's going to go first from Mr. Sullivan, I guess. Good afternoon, Your Honor. My name is John Sullivan, and I'm here representing Liberty Mutual Insurance Company. So the first issue here today is whether the district court was bound by the statute of limitations ruling announced by the Pennsylvania Superior Court on BOC in 2015. What's your feeling about certifying some of the issues of state law here? What is your feeling about certifying some of the issues of state law here? So, Your Honor, I don't think you need to certify it or that this court needs to certify it because of the following. Allegheny's position here is that, and this is from page 25 of their brief, that Moffitt stands for the proposition that the statute of limitations for a policyholder's suit against an insurer, and this is a quote, does not begin to run upon the date of insurer's breach. And that position is fundamentally inconsistent with Pennsylvania law. And, Your Honor, I'd refer the court to the 2017 decision of the Pennsylvania Supreme Court in an Erie Insurance Exchange versus Bristol, in which that court specifically refused to create what it referred to as a special rule for determining when the statute of limitations begins to run. For insurance cases. Instead, that court said, unless a statute specifically requires otherwise, the statute of limitations in insurance cases should be based on general contract principles, which means, and this is what the court said, that the statute of limitations would begin to run when the insurer is alleged to have breached its duty under the insurance contract. In this case, I'm sorry, was in 2010. Is that your position? That is correct, Your Honor. It was in September of 2010, when at that point in time, there was a discussion with Liberty Mutual, Hartford, and Allegheny over the impact of the Alabama Supreme Court decision and whether or not the insurers would participate in an upcoming mediation. And at that point in time, coverage was denied, and that coverage denial is memorialized in a September 15, 2010 email from the Allegheny risk manager. So, yes, that is what we view as the triggering event. And I know that Allegheny has pushed the notion that there is something called the Pennsylvania approach. But really, as Your Honor pointed out, the Pennsylvania approach, what they call that, is simply a 1964 decision from the Middle District of Pennsylvania and then two district court decisions, one from the Western District and one from the District of New Jersey. That approach has never been adopted by any Pennsylvania appellate court, has never been adopted by this court. And in fact, in the Sikorica v. Nationwide case, which Mr. Ryder made reference to, this court in 2005 rejected an argument based on Moffitt in which the policyholder had argued that the statute of limitations didn't begin to prove until judgment in the underlying action was final. And the court rejected it, finding that the Moffitt case was inconsistent with Pennsylvania state court rulings on this issue. So the bottom line here is that Allegheny is proposing an approach that has never been adopted by any Pennsylvania appellate court, never been adopted by the Third Circuit, and in the only cases where it's ever come up in appellate courts in Pennsylvania, it's been rejected. And more particularly, it is inconsistent with the Erie Insurance Exchange v. Bristol case, the 2017 decision of the Pennsylvania Supreme Court. And it's also inconsistent with the Selective Way case, which was the basis for the district court's decision here. And I did want to address an issue, so I don't forget it, which was a question that was asked, well, how could you address the duty to indemnify without the amount being determined? And that specific issue was addressed by the Pennsylvania Supreme Court back in 1997 in a case, General Accident v. Allen. And the court in that case said that the question before the court in a declaratory judgment is not whether the insurance company owes indemnification in a specific amount. It is whether the insurer has a duty to indemnify the insured in the event of liability. So, Your Honor, the fact that there isn't a judgment yet would not preclude the court from issuing a declaratory judgment on the issue of the duty to indemnify. How would that, and I know that's not in your case, but in your colleague's case, USF&G, how would that work when the underlying obligation contains a deductible, which is tantamount to a deductible? Would that complicate that formula that you're proposing? Well, I think it may complicate it somewhat, and maybe I'll let Mr. Miller address it because he knows more about the deductible issue than me. But the issue, Your Honor, in that case is the question of how the deductible applies. A court could determine how the deductible applies and what the language means, even if we don't know in that particular moment what the math will be, what the mathematical impact will be. I also wanted to address another issue that was raised by Mr. Ryder with respect to statute of limitations for bad faith claims versus breach of contract claims. So there is a substantial amount of Pennsylvania case law that has specifically talked about the statute of limitations in the context of a bad faith claim, and that has said the statute of limitations begins to run at the time of the coverage denial. So, Your Honor, a bad faith claim involves a claim by the policyholder that the insurer refused to defend or indemnify without a reasonable basis. It is a claim that focuses on the conduct of the insurer in the context of denying coverage. A breach of contract claim is based on the same denial of coverage. It would make no sense that in this case, the statute of limitations for the bad faith claim would begin to run in 2010 at the time of the denial. But the statute of limitations for the question of whether there was a breach in the first place wouldn't run according to Allegheny. It still would not have run because they settled the case in August of 2017. So, we're still five months from the expiration of the statute of limitations according to Allegheny. That just isn't consistent with Pennsylvania law and isn't consistent with the whole notion that statute of limitations are supposed to be strictly construed. Now, Your Honor, I'm looking at my time and I know I am over so I don't want to... I don't think, unless I missed it, Patrick has not given me the horseshoe yet, but he's not over, is he? You're getting close, but I think you've still got a minute. Yeah, his time is up. Okay, all right. Okay. Staying corrected. Once again, I'm reversed. Okay. If you can just take a second to wrap up then and we'll proceed to Mr. Jones. Sorry, I missed it. Your Honor, I would also say that going to the merits of this claim beyond the statute of limitations, we're in a position here where the record actually reveals that no one ever believed that the plaintiffs were entitled to recover for bodily injury prior to 1999, which is when Liberty was on the risk. In fact, contrary to what Allegheny said, during the oral argument in the summary judgment in the underlying case, the plaintiffs admitted that the controlling case was the case that said they couldn't recover. When they settled, they said we couldn't recover for injuries prior to 1999. So first of all, I think that they were correct. I think that indicates we had no duty to defend or identify. At a minimum, since everyone had the exact same opinion, it indicates that Liberty Mutual was not in bad faith for sharing that approach. So, Your Honor, with that, I appreciate your giving me another 30 seconds or so. Well, that was lawyer time. It was a little more than 30 seconds. All right. Mr. Miller? Your Honor, James Ruggieri. I'm sorry. If I may, before Mr. Miller, keep on theme there with Mr. Sullivan. May it please the Court, James Ruggieri for FLE's Hartford Exit Indemnity Company and Hartford Casualty Insurance Company. Your Honor, I would like to tackle the first question that you asked both counsel prior to my argument, which is whether it would make sense to certify this issue to the Pennsylvania Supreme Court. My answer to that is no, and it's twofold. I think that this is not a case where we have any sort of disagreement among the Pennsylvania State Appellate Courts on a state law issue. As Mr. Sullivan said, we have three recent State Appellate Court rulings in Selective Way, Green and Bristol, all of which make it abundantly clear that we're supposed to apply the normal rules applicable to statute of limitations unless, as Selective Way tells us, the Pennsylvania Supreme Court or a statute says otherwise. And neither the PA Supreme Court or a statute says otherwise with regard to insurance contracts. So, doing what the District Court properly did, which is to follow the State Court precedent, the District Court followed the applicable rules for declaratory judgment and breach of contract actions. I also would note that this is not a situation where we have any federal court authority, Moffitt and Wiseman, that came down in the middle of those three court cases or since those three court cases. So, we have two federal district court cases that ruled based on what I recall the court saying, a dearth of Pennsylvania State Court appellate authority, but now we no longer have a dearth. We have three appellate court cases that all come down and tell us what we need to do in the absence of the Pennsylvania Supreme Court or the legislature telling us otherwise. So, here, I don't believe that there's any reason to certify this issue to the Pennsylvania Supreme Court, coupling that with something we'll get to later on, which I also think on the merits, Allegheny's claim fails. So, that would be another reason not to certify in this case. The other issue, Judge McKee, that you asked, which I thought was a good question, which is… Is that the only one that you thought was a good question? I thought there were two. Judge, I thought there were two really good ones. Only two? Damn. Two is good. Two is good. 220, my God. I don't know of two good answers. I hope so. Well, for the record, you didn't say that Bustapo or Fuentes asked any good questions. They were all excellent. They were all excellent. Mine are good and yours are excellent. Their thoughts coming into the loop were equally excellent. Way to go, counsel. Your Honor, you asked if we should be concerned about setting the clock too early. This is not a case where we have to worry about setting the clock too early because this is a case where Allegheny said that we were in breach in 2010. And this is a case where the policies at issue have both a duty to defend and a duty to indemnify. The breach of the duty to defend is incentive enough to file suit within the statutory period of that breach because that's when you're incurring real harm. You're actually incurring a loss of real dollars that are immediately owed and immediately due. So you don't file suit within that. You're putting money out of your own pocket. So it's not a situation where you have sort of incentive to sort of kick back and just let it see how it plays out. The other point, Judge, with regard to a duty to defend is if the insured within the statutory period for the breach file suit on the duty to defend, and if it loses, then we know the carrier has no potential indemnity obligations. So it doesn't matter when that underlying suit resolves because the duty to defend is broader than the duty to indemnify. So a ruling against the policyholder with regard to the duty to defend necessarily resolves any dispute over the duty to indemnify. And it doesn't matter when the underlying suit resolves because the carrier is not going to have to pay anything either way. Judge, so those are my points there. With regard to arguments that Allegheny makes in his briefs, again, it testified a deposition that, yes, Hartford and Liberty breached in 2010, but it said it doesn't matter because we were mistaken. We made a mistake. This court fully knows the Pennsylvania Supreme Court precedent, including the Cochran versus GAF case, which is now a mistake does not toll the running of a statute of limitations. And there, the unfortunate casualty of that rule was an asbestos worker who lost his claim against asbestos manufacturers because he didn't go to the doctor quickly enough. So the court said, no, no, you're presumed to know your legal rights. That's what the law requires. And a mistake is not an excuse. You should go consult a lawyer here. If Allegheny had a right to coverage from Hartford after the Belcar ruling in 2009, then it had that right. The law presumes it had that right and knew about that right. The clock starts ticking because Hartford stopped defending, and Allegheny had four years to file suit, and it didn't. So again, Supreme Court precedent doesn't help. Judge, counsel didn't mention it, but there was a fair amount of attention paid to Hartford's December 29th, 2010, indemnity denial letter at the joint appendix, 3459. And I did want to talk a little bit about that because they try to sow confusion with it. It's not confusing, Judge. They admit that Hartford did send a letter saying they were denying indemnity coverage, and we did. They say it wasn't good enough. The district court agreed, and the district court was right, Your Honor. Allegheny points out, well, your letter didn't say that you were declining coverage for defense costs. Well, that's right, because Hartford knew that it had to pay a share of defense costs that were incurred prior to the Bell Car ruling that hadn't been trued up. Those costs, Your Honors, weren't trued up until August 2013. That's when Hartford made its last payment on account of those pre-Bell Car defense costs. So it couldn't say, we're out of here. It still had that obligation, and I would note that Allegheny didn't even file within four years after that happening. It filed more than four years after. Then Allegheny says, well, in your letter, you said there may be no indemnity coverage under the policies. That's right, because if you look at the letter, Policies, capital P, was defined to include both the primary policies and the access policies, and it said, we're going to talk about each of those separately below, and the letter did that. With regard to the primary policies, Hartford issued in bold, indemnity denial. We're not going to pay defense costs. And then, with regard to the access policies, it said that those policies aren't implicated unless there's a showing of underlying exhaustion. You haven't shown exhaustion. If and when you make that allegation, then we'll give you a complete coverage analysis of our obligations. But oh, by the way, in a note, we're probably not going to cover this either, for the same reason that we're not covering it under the primary policies. And that reason, your honors, gets us to the merits issue here, which is the alternative ground for affirmance of the district court, even if Allegheny's claims weren't time-barred, which I believe they clearly are, as the district court correctly ruled, based on the Pennsylvania precedent, that alternative ground is the merits. Allegheny wasn't wrong in 2010. Allegheny was exactly right that Hartford and Liberty didn't have any ongoing obligations to participate in the defense or any potential for indemnity coverage. And it was right because the Alabama Supreme Court, in rulings both before and after the 2009 Belcar ruling, said, look, and judges, your honors, I'm not going to say this is good or bad. I'm not saying I would have come out the same way. But they said, look, the rule here is an exposure rule. And here, an underlying claimant in a toxic tort case can only recover damages for bodily injury that takes place within the statutory period, within the limitations period, between the years here of 1999 and 2005. Now, to be sure, the Alabama Supreme Court has changed that rule prospectively in the Griffin case. But the Jerkins case said, no, the rule that follows, except for those prospective application cases, is the rule establishing Garrett. And the rule establishing Garrett meant that the Belcar plaintiffs could not, as a matter of Alabama law, recover damages on account of my client's policies, the last of which primary policies ended July 1, 1985, which is 14 years outside the statutory period. Your honor, Let me just get you out there. Let's go over a little bit better. Sure. Because next time I want to try the real things in a little bit. We do understand your argument, and I don't want to be rude to you. But unless my counsels, my colleagues have any questions, I'll steer back. And thank you, your honor. Thank you for your time. No problem. Mr. Brady, is there some rebuttal, I believe? You're muted, Mr. Miller. You're muted. Good afternoon, your honor. I haven't had the opportunity to argue yet. And I had a separate 10 minutes, you said. Okay. So if I may, may I proceed? Yep. Too many little faces on my screens. Looking at this like Hollywood sprayers. Go ahead, Mr. Miller. Thank you. Good afternoon, your honor. And to the panel, good afternoon. I represent Appalachia, USF and G. I would like to address the one question. Allegheny Ludlam's claim of wantonness argument first. Allegheny Ludlam relies essentially on two arguments in order to seek reversal for the finding that the wantonness claim as pled did not represent an occurrence under the policy, and neither of their arguments have merit. First, Allegheny Ludlam essentially argues that because Alabama law allows this claim of wantonness to be proven by recklessness, that such claims necessarily are covered under the USF and G policy. But it's Pennsylvania coverage law that determines whether there's coverage under the USF and G policy. And under Pennsylvania law, it is not the label of the claim pled. It is the factual allegations as pled by the plaintiffs in order to support that claim. It's not universal law. I don't know, but I'm guessing that principle is not unique to Pennsylvania. It's pretty basic. This court has articulated that principle in numerous decisions, as has the Pennsylvania Supreme Court. Now, Mr. Ryder referred to the wantonness claim here as it is a recklessness-based claim, but it's not. And we pointed to the court the specific allegations made by the Bell Car Plaintiffs. They allege deliberate action in that they specifically allege that Allegheny Ludlam willfully and wantonly manufactured, sold their welding products, injuring the plaintiffs while knowing of the existing conditions and being conscious that from doing that sale and manufacture, injury would likely or probably result to the plaintiffs. Those allegations of a knowing of the conditions, deliberate action, and being conscious that injury would likely or probably result doesn't allege an occurrence or an accident under Pennsylvania law. Pennsylvania Supreme Court has defined accident to mean an unexpected or undesirable result or something that occurs unexpectedly or unintentionally. That's from Caverner. Now, the court said that an injury is not accidental if the injury was the natural and expected result of the injured's actions. That's what the plaintiffs here pled. Wantonness can be proven by intentional and deliberate action. You don't have to decide you want to prove it by recklessness. And the underlying plaintiffs decided not to. They went and they alleged deliberate action and conscious knowing of the expected result. That's not an accident. Now, the second argument that they make is based upon the Pennsylvania Superior Court's decision in Illitsky, which predated Caverner by at least a decade. They argued to you that the Illitsky decision governs the interpretation of the term occurrence in the USFG policy. But that decision construed an expected and intended exclusion in the policy. And the court held that is determined by a subjective analysis. In other words, bodily injury expected or intended by the insurer, a subjective analysis. But as this court correctly noted in the Sapa decision, the Pennsylvania Supreme Court in Caverner and then Baumhammer's took a different approach with respect to the definition of occurrence being an accident in the coverage grant. And held that the finding that essentially that the element of fortuity and the concept of accident is not measured subjectively. It is measured objectively. And here, the USFG definition of occurrence is an accident. There is no subjective language. So Illitsky does not control the interpretation of the term occurrence and accident. Caverner does. And the point is that once the Supreme Court of Pennsylvania lays down a rule about how a particular phrase in a policy is to be construed, then it should be construed in that manner, regardless of the nature of the action. Whether it's faulty workmanship like in Caverner, whether it is a circumstance involving haver, a pharmacist distributing medicine, beds without prescriptions, or this court's Melman decision. Shooting by an intoxicated person where negligence was alleged. The question is what is alleged here, the allegations are deliberate acts and conscious knowing the result would occur. What about the deductible? I don't mean to cut you off. That's fine, Your Honor. What about the deductible in your policy? You would concede it is a deductible. Correct. But there is no issue on appeal before this court regarding the USFG deductible. There was not a disagreement about its application before the district court. So I'm not sure what issue, unless you're asking a question about how the deductible might apply in the context of the statute of limitations, but we didn't have a statute of limitations issue. That's not an issue for USFG. That's not one that divides us in Allegheny above. What about the pollution? What are the pollution exclusions? Let's talk about the pollution exclusion. The pollution, the district court clearly, in my view, correctly found the Pennsylvania Supreme Court's Madison decision is on all fours and it controls this case. Why is that? This case involves, and there's no doubt about it, and in fact it was admitted, we'll get to that, allegations by the Belcar plaintiffs of being exposed to welding fumes containing hexavalent chromium that caused them bodily injury. And the question is, does that unambiguously establish bodily injury, which would not have occurred, but in whole or in part, but for the actual alleged or threatened discharge dispersal release of pollutants at any time? Now, in Madison, you had concrete curing, so the company was curing concrete. The worker was overcome by fumes emanating inside of an enclosed area, and as a result of that exposure to those fumes, was injured. Madison specifically held that first there was a pollutant, and although Allegheny 11 did not concede that below, on appeal they've conceded that the welding fumes are in fact a pollutant, and in fact fumes is part of the definition of pollutants. The Madison court then went on and found that based upon the factual predicate in the underlying action, not in the coverage action, in the underlying action, it was clear that the plaintiff there alleged that he was harmed by the inhalation of the fumes, and that fumes clearly move. And based upon an MSDS sheet showing movement here, the Madison court found that there clearly was a release and a dispersal of the pollutant. As the court said, they're fumes, and they're clearly dispersed. So, Allegheny Ludlum tries to hitch on to the Steele case, a subsequent Pennsylvania Supreme Court decision, but Steele is completely an opposite. Steele did not alter Madison's rules for analyzing the pollution exclusion. Rather, it expressly followed Madison's analysis, yet found the pollution exclusion's requirement of a discharge dispersal release was not unambiguously satisfied with reference to the slow, imperceptible process by which lead-based paint becomes available for inhalation, the exfoliation over time. But Madison found that fumes indeed satisfy, clearly satisfy the dispersal release element, that movement element of the pollution exclusion. And all you need do to see the flaw in Allegheny Ludlum's position is go to Matt Condine, the Pennsylvania Superior Court's decision from 2003 decided after Steele. And in that case, the court held, essentially they considered the identical pollution exclusion before you today, held that a worker who was injured by inhaling carbon monoxide fumes inside of a mall, that in that circumstance, the pollution exclusion applied and the finding the element of discharge was clearly established. There's no issue here about the method of intake, it was inhalation. No issue. In fact, and let's get to that argument. Allegheny Ludlum's argument about burden of proof. They argued USF&G failed to meet its burden of proof in this coverage action, either because we needed evidence other than from the underlying Belcar litigation, including expert testimony, or that USF&G was required to prove that the Belcar plaintiff's injuries were approximately caused by the welding of Allegheny's steel. There's no support in law for that, nowhere, and they've not cited even one case for it. So let's start. The duty to indemnify, which is what we're dealing with here, is based on the facts developed in the underlying case for which the policyholder seeks coverage. That's, that's the test. Okay, duty to defend is look at the underlying complaint, does it potentially state a claim within coverage, but indemnity is based upon the facts actually developed in the underlying case. And when the undisputed material facts in the underlying action established that the matter is not covered, and no indemnity, a motion for summary judgment is the proper vehicle under Rule 56 to obtain a declaration from the court. And here USF&G supported its motion for summary judgment with a concise statement of material facts that Allegheny Ludlum did not, and in fact could not contest on all of the necessary elements including movement and motion of the fumes. And it was clear that the Belcar plaintiff's case was confined to one wholly involving inhalation of welding fumes containing hexavalent chromium. Allegheny Ludlum did not deny any of those statement of facts. They did not offer any counter facts. And indeed, based on their own material safety data sheets, which acknowledge the human health risk of the inhalation of welding fumes from welding their steel, they could not do so, and they did not do so. And I would note that in Madison, the Supreme Court relied upon material safety data sheets for its finding. Now, they also suggest that USF&G was required to prove that the Belcar plaintiff's injury was actually caused by the welding of Allegheny Ludlum's steel, as opposed to lots of other defense. Number one, that issue was waived. You will not find it in the briefing below. Number two, it has no merit. As a matter of coverage, Allegheny Ludlum must first establish that the claim falls within the coverage of the policy. It must show its liability resulted from damages due to bodily injury caused by an occurrence. They have the burden under Jacobs' construction and other cases. It's clear they have the burden to place their claim within coverage in the first instance before you get to an exclusion. So if they can't prove that the case involved bodily injury resulting from their products, then there's no coverage at all. We're done. So this whole argument of theirs is nonsensical, because if there was no bodily injury suffered by these plaintiffs resulting from their product, then there's no coverage in the first instance. Next, they argue that this argument about USF&G having to prove in the coverage case that the injuries were approximately caused by Allegheny Ludlum's steel and the welding fumes therefrom. There's no support in the policy for that, and the Supreme Court has rejected it. And you can also look at the Superior Court's MatConn-Diamond decision, because there the court looked at the identical, in whole or in part, but-for language, and found it was even more unambiguous. Taken to its logical conclusion, essentially Allegheny Ludlum is saying the insurer has to prove that its insurer was liable in the underlying case, and there's no support in law for that. Indeed, think about it. The duty to defend is based on the allegations in the complaint. There are a plethora of cases by this court, the district courts, the Supreme Court, wherein looking at the allegations of the complaint, the courts decide there's no coverage, not within the coverage of the policy. The carrier insurer doesn't have to prove that the injuries, in fact, occurred, because the allegations are outside of coverage. And finally, with respect to experts, an expert is not required in a coverage case to prove what Allegheny Ludlum admitted were the facts below for application of pollution exclusion, that welding fumes did disperse and migrate from the welding of their steel, the welding fumes contained hexavalent chromium, a known toxic pollutant, and that the plaintiffs alleged they were injured from the inhalation of those fumes. On those facts, there was no dispute at all. So there is no support for the notion that USF&G needs to bring an expert into the coverage case. Was an expert required in the Madison decision? No. Was an expert required in the MatConn-Diamond decision? No. Was an expert required in the other pollution exclusion cases recited to the court? No. And the only reason why an expert was required in steel was because the obviousness of the dispersal, which you have with fumes, was not apparent from this slow, microscopic, imperceptible release of lead from paint. So, Judge McKee, one thing I would ask you is, is there an issue about the SFR that you believe that's troubling you that I can perhaps answer? I was just curious about it. You've answered the question. No, I wasn't. I think you've answered it very, very well. No, I was just curious about it because I've just seen the amount that would apply there, given the million dollar settlement, which seems actually like a kind of low settlement was signed off on. It just seemed kind of curious to me and that's why I asked about it. Well, my client's self-funded retention endorsement is a vehicle by which the policyholder here, Allegheny Loveland, gains control over its defense and settlement claims that fall beneath that $1 million self-funded retention. So, there are a variety of different business issues, reasons why I assume a policyholder would select that type of policy. But they were in control of the defense and in control of settlement, and my client essentially delegated that obligation and monitored and accepted reports. Thank you very much, Mr. Miller. Your time is up. Now, if I'm not once again forgetting anyone, I don't think I am, we'll hear Mr. Reeder on his rebuttal. You're muted. Mr. Reeder, you're still muted. Still muted. We can't hear you. Your colleagues probably think that's a message from above, but we're not able to hear you. Take your mute off. You're still muted. Bottom left part of your screen, the little microphone. This could be a Saturday Night Live, actually. On the bottom left of your screen where it says mute, there's probably a red. There you go. All right. Okay. You're with us. All right. We're sorry about that, Your Honors. Do you want to incorporate everything into your argument that you just said while we couldn't hear you? Yes, yes. On the statute of limitations issue, you had raised the possibility of a certification. One thing that occurs to me is that the statute of limitations defense is one that can be disposed of by the court without engaging in the legal issue about whether the Moffitt rule or the insurer's characterization of Pennsylvania Superior Court authority applies. And that is that the premise of the insurer defense is that in 2010, there was a breach, that there was a denial of coverage. And the record before the court, as we set forth in our brief, shows that Liberty Mutual never wrote a letter denying coverage until 2017. That Hartford wrote a letter in 2010, in which despite counsel's able effort to argue otherwise, on its face makes clear that Hartford is defending, is defending the case going forward, not just in the past. And so the basic predicates to the theory that the statute began in 2010 are simply not present here. The record before the court shows clearly that there was not a breach and that the determination of whether there was a breach or not is dependent upon what happened at that point in time. It's true that Allegheny was mistaken about whether there was a coverage obligation, but that is not relevant for purposes of whether an insurer did or didn't breach. On the wantonness issue, I would simply point out to the court, as we did in our papers, that if you read the Belcar complaint, there is an express statement about recklessness. Secondly, that there is a fundamental distinction under Pennsylvania law between act and injury, and a policyholder that acts intentionally is not barred from coverage. The question is whether the policyholder intended or had the requisite element of fortuity with respect to the ultimate injury. And that's the critical distinction between this case and all the cases that the insurers rely on. This is a case where the record before the court does not support the proposition that from the perspective of Allegheny, the injuries suffered by the underlying plaintiffs were expected. And that is further developed in our brief. Lastly, I would simply point out, Your Honors, that the Steele case is the most recent Supreme Court case. It does not allow for what USF&G wishes to do here. And furthermore, the fact pattern here of 25, 30, 40 years of an injury process is fundamentally different than every other one that the USF&G relies on. Thank you, Mr. Reader. I appreciate your argument. I want to commend all counsel on really superb arguments. It's not often that we have this many attorneys assembled to begin with, but when we do, consistently superb argument from all counsel. So I really commend you. It speaks very, very well for you and very, very well for your firms. It's very helpful to have attorneys of your caliber making arguments to us. I will ask for a transcript, and I'll ask, I guess, that that be divided equally amongst all parties here. It's probably the best way to do it. And Patrick can speak with you about the best way to go about requesting and getting that transcript. So, Mr. Reader, you look like you had a question. No, no, no. Thank you, Your Honor. Okay, no problem. Thank you very much, and we'll take it as advisement. Do well, gentlemen. Enjoy your weekend.